GEORGE MYRON, PETITIONER, v. ORANGE DAIRY CO.,
RESPONDENT.

Decided June 3, 1940.

For the petitioner, *Joseph L. Magrino* (*John J. Francis*,
of counsel).

For the respondent, *Arthur Mead.*

\*        \*        \*        \*        \*        \*        \*

Subsequently, and on February 11th, 1940, an amended
petition for compensation was filed which changed the nature
of the claim for compensation from one for further compen-
sation because of increased disability to an original petition
for compensation. In this amended petition, petitioner
alleged that he had been paid temporary disability for sixty-
two and six-sevenths weeks at $20 weekly and twenty per
cent. total permanent disability, and he alleged that this per-
centage did not represent the proper and true disability which
he had suffered as the result of the accident referred to
therein. Answering the amended petition, respondent asserted
that by paying the twenty per cent. of total permanent disa-
bility, it had fairly and adequately compensated petitioner
for all of the disability which resulted from the accident.
\*   \*   \*

At the outset of the trial, it was stipulated that petitioner
was regularly in the employ of the respondent and that at

about eleven A. M. on December 28th, 1935, he suffered an accident which arose out of and in the course of his employment. Thereafter, he was paid temporary compensation for sixty-two and six-sevenths weeks at his compensation rate of $20 weekly, amounting to $1,257.15. He was also paid twenty per cent. of total permanent disability, or 100 weeks at $20 weekly, amounting to $2,000.

The petitioner, George Myron, on being called to the witness stand, testified that on the morning of the day above referred to, while engaged in the course of his regular work for respondent, he injured the lower part of his back while pushing a conveyor which was loaded with cans or crates of milk. He advised the president of his employer of the accident and continued to work. Thereafter, and despite severe pain in his lower back, which he called to the attention of his employer on several occasions, he continued to work without medical attention. On May 14th, 1936, he fainted while at work and was then sent by his employer to Dr. C. Norton Tillotson of East Orange. After a few treatments by Dr. Tillotson, Myron was instructed by his employer's insurance carrier to report to Dr. W. C. Calvert of Orange for treatment. He did so and after examination was advised by Dr. Calvert that he had a strain of the muscles of his back which would probably clear up with the exercise that went along with his work. Myron returned to work and because of pain in his back while doing so, he again visited Dr. Tillotson, who recommended that he be X-rayed. On June 22d, 1936, X-rays were taken by Dr. Ernest May of East Orange. On June 24th, he received a call from Dr. Tillotson advising him that Dr. May's X-ray report had been received. Myron went to Dr. Tillotson's office, obtained the X-ray report, and took it to Dr. Calvert. A few days later, he was advised by respondent's carrier to report to Dr. Smith of the Orthopedic Hospital in Orange, New Jersey. He went there on June 29th, and after clinical and X-ray examination by Dr. Smith, was put on a spine bed in the hospital. He remained at the hospital until July 20, on which day he was released after having been fitted with a back belt. Every second day thereafter until August 16th, he received treatment from Dr.

Smith and on that day was discharged with instructions to wear the belt steadily.

On or about July 20th, 1937, respondent's president came to Myron's home and offered to give him work. At this time, he was still sleeping on a spine bed at home and wearing the belt and he asserted that although he felt unable to work, he had to do so because of his pressing need for money. On October 14th, 1937, he was forced to cease even the light work that he had been doing because of his back condition. During the last week of October, he was sent by respondent's carrier to Dr. Henry H. Ritter of New York for examination. Following this examination, he was admitted to the Post-Graduate Hospital in New York on November 2d and on November 11th, a fusion operation was performed on his lower back. Thereafter, and until December 17th, 1937, he remained in the hospital. On that day he was permitted to go home, still wearing a body cast. On January 19th, 1938, he was re-admitted to the hospital and following the removal of the cast and the taking of X-rays, he was discharged January 21st, 1938. On February 18th, 1938, he returned to Dr. Ritter's office in New York for examination and at that time was measured for a Taylor brace, which was supplied to him a short time thereafter. Dr. Ritter treated him eighteen times thereafter, the last treatment being on October 4th, 1938. Since that time, he has worn the brace off and on, and on some occasions it seems to help him. Petitioner further asserted that his condition has not improved since the operation. He has had and still has down to the present time, almost constant and severe pain in his lower back. He is unable to stand on his feet for any length of time without becoming exhausted. He cannot do any lifting whatever. He has severe headaches, is extremely nervous, and when subjected to any excitement or emotional strain, goes completely to pieces, and as he puts it, "just shakes all over."

Petitioner called Dr. Leo Szerlip, an orthopedic specialist, who testified that he examined Myron on February 5th, 1940. Examination disclosed that Myron walked with a somewhat protected gait. His lumbar muscles were spastic on both sides. The lumbar curve is obliterated to a con-

siderable degree. There is a long curved scar from about the twelfth dorsal vertebra to the lower end of the sacrum. Spinal motions are considerably restricted in forward flexion, and lateral bending. Hyperextension is possible only through a very few degrees. All motions of the spine are accompanied by complaint in the lumbo-sacral area. There is present a one-half inch atrophy in the left calf and a long scar in the anterior aspect of this leg. The straight leg bending test is positive and causes pain in the lumbo-sacral area. Dr. Szerlip also examined X-ray plates which were taken of petitioner by Dr. Anthony DePalma on September 15th, 1939. These X-rays show the lumbar spine and pelvis in the antero-posterior and lateral views. They show a considerable amount of an opaque material in the spinal canal and in the soft tissue of the back and buttocks. This opaque material is lipiodol which was injected in the spinal canal for diagnostic purposes in connection with the fusion operation. The X-rays also showed an exostosis at the superior and anterior margin of the third lumbar vertebra, but the body of the vertebra does not appear to have been narrowed. They also showed evidence of a small bone graft from the first to the third lumbar vertebra. The doctor advanced the opinion that this lipiodol is an irritating substance and that the irritation may increase as time goes on. He advanced the opinion that Myron is suffering from a disability of fifty per cent. to sixty per cent. of total.

Petitioner also called Dr. Anthony DePalma and Dr. M. DeFronzo, whose findings were much the same as those of Dr. Szerlip, and who also advanced the opinion that petitioner was suffering from fifty per cent. to sixty per cent. of total permanent disability.

Dr. Samuel Hirschberg, a neurologist, also examined petitioner on February 17th, 1940, and he testified that petitioner is suffering from ten per cent. of total permanent disability from a neurological standpoint alone.

In defense, respondent called Dr. Charles Baker, an X-ray specialist, who X-rayed petitioner on January 29th, 1937, which was before the operation referred to, and on October 6th, 1938, after the operation. The first X-ray in the doc-

tor's opinion showed no fractured vertebra, but they did show some exostosis of the upper margin of the third lumbar vertebra and some of the bottom thereof and some of the second lumbar vertebra. The space was normal between the vertebra and there was no injury to or herniation of the nucleus pulposis. The doctor also testified that so far as the X-rays showed, he could see no reason for a fusion operation. The X-rays taken after the operation show the same conditions except where the evidence of the fusion operation appears. Upon request, the doctor examined the X-rays which had been taken by Dr. DePalma and which were marked *P-1* and *P-2,* and expressed the view that part of the bone which was used for the fusion of the lumbar vertebra had become absorbed. He conceded that both his own plates and those of Dr. DePalma showed the presence of lipiodol in the spinal canal and in the muscles and soft tissue of the lower back.

Dr. Henry H. Ritter testified in behalf of the respondent and said that he saw the petitioner for the first time on October 19th, 1937, and that at that time, Myron was suffering from a very painful back. All of the motions of the back were restricted and there was marked spasm of the spine muscles. He suggested that Myron enter the New York Post Graduate Hospital for further study and diagnosis. Myron did so and following the taking of X-rays the fusion operation was performed. In this fusion a piece of bone was removed from the left leg and attached to the spine from the first lumbar vertebra down to the sacrum. The doctor said that the operation was performed to relieve the petitioner's painful back and that there was no fracture of any of the lumbar vertebra and no injury to any intervertebral disc. After the operation he continued to take care of Myron and finally discharged him on October 4th, 1938. On the date of his last examination he felt that there had been a very great improvement in petitioner's condition as a result of the operation, and he fixed the permanent disability at from ten per cent. to twenty per cent. of total. This, he said, was an "arbitrary" figure.

On being questioned as to the presence of lipiodol in the spinal canal and in the soft tissue and muscles of the back, he conceded that it was there and said that some persons are allergic to it. In such persons, lipiodol acts as a general irritant. When it acts as an irritant, a maximum point of irritation is reached which becomes fixed and permanent.

Dr. J. Irving Fort also appeared for the respondent. He examined the petitioner on three occasions, the first being September 11th, 1936. At that time petitioner had a very painful back and the motion thereof was limited to the extent of eighty per cent. At this time the doctor felt that Myron's disability was total. On the second occasion, January 19th, 1937, the objective findings were the same and total disability still existed. The last examination was made on November 6th, 1939, which was after the fusion operation. At that time, according to the doctor, petitioner's condition had improved considerably. There were points of tenderness along the fourth and fifth vertebra, forward motion was limited thirty to thirty-five degrees and rotation limited to ten degrees. He examined the X-rays of Dr. Baker and confirmed the diagnosis of the presence of lipiodol and said that the bone graft extended from the first to the third lumbar and that the bone graft from the third to the fifth lumbar vertebra had been absorbed. In the doctor's opinion, there was no evidence of a fracture of any of the lumbar vertebra nor of injury to the nucleus pulposis. In the doctor's opinion, on the date of his last examination, petitioner was suffering from fifteen per cent. to twenty per cent. of total permanent disability.

It appeared that petitioner had been examined on behalf of respondent by a neurologist, Dr. Ambrose Dowd. Dr. Dowd was not produced at the trial and on a demand by petitioner's counsel for the production of the doctor's report, it was produced upon the agreement that it would go into evidence. Counsel consented and the report was marked. Examination of it disclosed that Dr. Dowd fixed petitioner's permanent disability at thirty to thirty-five per cent. of total, which he said resulted from the back condition and a psychoneurosis.

After considering carefully all of the testimony adduced by both petitioner and respondent, I have come to the conclusion that petitioner sustained no fracture of any of the lumbar vertebra, nor any injury to any of the intervertebral discs of the lumbar vertebra in the accident which brought about this claim for compensation. I do find, however, that respondent's payment to petitioner on the basis of twenty per cent. of total permanent disability did not and does not adequately compensate him for the disability resulting from the accident. It is my conclusion that petitioner is suffering from a permanent disability of fifty per cent. of total disability which has resulted from the fusion operation that was performed on his back and also from the irritating effect of the lipiodol which was injected in his spinal canal. Under the circumstances, it is on this 3d day of June, 1940, ordered that compensation be awarded to petitioner as follows:

An additional thirty per cent. of total permanent disability, or 150 weeks' compensation at $20 weekly, amounting to $3,000. Since respondent paid compensation to September 24th, 1939, under its voluntary award of twenty per cent. of total permanent disability, payment of compensation under this award is to begin as of that date.

\*  \*  \*  \*  \*  \*  \*

JOHN C. WEGNER,
*Deputy Commissioner.*